UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STEP BY STEP, INC.,

                Plaintiff,

      -v-                          7:15-CV-925

CITY OF OGDENSBURG,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                        OF COUNSEL:

COOPER, ERVING LAW FIRM       CARLO ALEXANDRE C.
Attorneys for Plaintiff             DE OLIVEIRA, ESQ.
39 North Pearl Street, 4th Floor
Albany, NY 12207

SUGARMAN LAW FIRM LLP        PAUL V. MULLIN, ESQ.
Attorneys for Defendant
211 West Jefferson Street
Syracuse, NY 13202

DAVID N. HURD
United States District Judge

## **TABLE OF CONTENTS**

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.   LEGAL STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      A.    Subject Matter Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      B.    Failure to State a Claim.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      C.    Preliminary Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      D.    Relevant Statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.   DISCUSSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      A.    Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      B.    The City's Motion to Dismiss. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          1.      Disability Under the FHA and ADA. . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          2.      FHA's Definition of "Dwelling". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   C.    Preliminary Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          1.      Substantial Likelihood of Success on the Merits. . . . . . . . . . . . . . . 16

                a.    Disparate Treatment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                      i.     Supermajority Requirement. . . . . . . . . . . . . . . . . . . . . 17

                      ii.    Other Applications. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                      iii.   Delay. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                      iv.   Amendment of the ARD Law. . . . . . . . . . . . . . . . . . . . 21

                      v.    Local Opposition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                      vi.   Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

                b.    Disparate Impact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

          2.      Irreparable Harm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

          3.      Balance of Hardships. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

          4.      Public Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

          5.      Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

          6.      Security. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

V.      CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

<u>**MEMORANDUM–DECISION and ORDER**</u>

# I. <u>INTRODUCTION</u>

Plaintiff Step by Step, Inc. ("SBS" or "plaintiff"), a New York not-for-profit corporation that provides outpatient mental health support services, has filed this action against defendant City of Ogdensburg (the "City" or "defendant"), located in Saint Lawrence County, New York. Plaintiff brings claims pursuant to the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. (the "FHA") as well as the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. (the "ADA") alleging that defendant's refusal to approve an application for a Planned Development District ("PDD"), which would authorize plaintiff to establish a housing unit for individuals with mental illnesses, constitutes unlawful discrimination on the basis of plaintiff's clients' mental disabilities. Presently under consideration are (1) plaintiff's motion for a preliminary injunction and (2) defendant's cross-motion to dismiss. Both motions were fully briefed and oral argument was heard in Utica, New York. Decision was reserved.

## II. __BACKGROUND__[1]

SBS presently provides services to individuals with mental illnesses at its offices located at 103 Ford Street in Ogdensburg, New York. In September 2014, plaintiff purchased a former elementary school located at 1515 Knox Street in the City (the "Site"). The Site is located in an area zoned for single family residential structures.

In April 2015, SBS filed an application with the City to rezone the Site from a single family residential district to a PDD. Plaintiff planned to redevelop the Site into a combination of supportive housing, respite / hospital diversion housing, rental office space, and mental health support services for its mentally ill patients.

Pursuant to the Ogdensburg City Code, an applicant seeking to develop or redevelop significant land areas must obtain the approval of the Ogdensburg City Council to amend the zoning map and establish a PDD. As Article IX of the City Code explains, the purpose of a PDD is to provide:

> (a) a means of developing or redeveloping significant land areas considered appropriate for residential, recreational, commercial or industrial use; or a combination of these uses in a unified site design that allows economies of scale, creative planning and design concepts to be used . . . .

> (b) to uphold the spirit and intent of this chapter to promote orderly growth and sound development of the City and ensure that the health, safety and general welfare of prospective residents in the PDD and adjacent residents will be protected.

See Smith Aff., Ex. A, § 221-29.

_____

[1] The following facts are taken from the operative complaint, or from documents integral to it, and will be assumed true for purposes of resolving defendant's motion to dismiss. See, e.g., Krasner v. HSH Nordbank AG, 680 F. Supp. 2d 502, 508 n. 2 (S.D.N.Y. 2010).

To qualify as a PDD, an undeveloped parcel of land must be at least two acres in size or be a developed parcel that has at least 40,000 square feet.  Smith Aff., Ex. A, § 221-30. The City Code also sets forth the criteria for evaluating an applicant's proposed PDD:

    (a)    Conformance with the stated purposes of the PDD;

    (b)    Consistency with the Comprehensive Development Plan;

    (c)    Protection of established or permitted uses in the vicinity;

    (d)    Provision for usable open space and recreational areas as appropriate to the proposed use(s) and the surrounding neighborhood;

    (e)    Design and location so as to be safely and adequately served by roads, water supply, sewage disposal, stormwater drainage, snow removal, fire protection and school buses;

    (f)    Provision for advantages of flexible planned development over conventional lot-by-lot development such as the following:

        (1)    Increased recreational areas and usable open space;

        (2)    Preservation of natural features of the site;

        (3)    Increased affordable housing opportunities;

        (4)    A compatible mix of housing types and/or uses;

        (5)    Decreased street and utility costs resulting from efficient design of the entire site and clustered development; [and/or]

        (6)    Provision of public waterfront access or other public amenity.

See id. § 221-31(F)(2).

At its April 13, 2015 meeting, the City Council referred SBS's application to both the City Planning Board and the Saint Lawrence County Planning Board to obtain each board's recommendation.

On May 11, 2015, while those referrals remained pending, the City Council conducted a public hearing on SBS's application and proposed use of the Site. A number of local residents attended, and both supporters and critics were heard on the issue.

On May 14, 2015, the County Planning Board considered SBS's application and voted to recommend disapproval. The City's Planning Board reached a similarly unfavorable conclusion four days later, voting 5-1 on May 18 to also recommend disapproval of plaintiff's application.[2]

Notably however, on May 27, 2015, the Chairman of the County Planning Board requested that the City Council resubmit SBS's application so that it could be reconsidered. According to this request, the County Planning Board had incorrectly believed the Site could be considered under the then-draft Adaptive Reuse District ("ARD") law, which modified the City's zoning code to create a new district for parcels generally associated with public and quasi-public use, such as former schools and churches, and provided guidelines and a process for their redevelopment. See City Code § 221-23. Nevertheless, on May 28, 2015, the City Council held a special meeting, where it voted 5-1 against plaintiff's PDD application without the benefit of any reconsideration by the County Planning Board.

---

[2] SBS submitted an amended application to the City Planning Board on May 15, 2015 to address concerns raised at the Board's initial meeting, which involved questions regarding the proposed hours of operation of plaintiff's facility as well as the number and types of housing plaintiff's facility would provide. At the May 18, 2015 meeting, Chairman Redmond acknowledged that plaintiff's amended application addressed these concerns. See Smith Aff., Ex. F, 1-4.

Thereafter, on July 20, 2015, the City Council voted to approve the ARD law. Under this new law, the standards for consideration of redevelopment applications are substantially similar to those for a PDD application. However, the ARD law is limited to parcels that are less than two acres. See City Code § 221-22. The new law also provides greater opportunities for public input, since it requires both the City's Zoning Board of Appeals and the City Council to conduct public hearings concerning applications for a permit under the ARD law. See id. §§ 221-25, 221-28.

On July 30, 2015, SBS filed the complaint and its motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure ("Rule") 65, which seeks an order directing the immediate approval of plaintiff's application to establish housing for people with disabilities at the Site. The City opposed and filed a cross-motion to dismiss pursuant to Rule 12(b)(1) and 12(b)(6).

## III. LEGAL STANDARDS

### A. Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005). "In determining the existence of subject matter jurisdiction, a district court may consider evidence outside the pleadings." Saleh v. Holder, 84 F. Supp. 3d 135, 137-38 (E.D.N.Y. 2014) (citing Makarova, 201 F.3d at 113). "Subject matter jurisdiction is a threshold issue and, thus, when a party moves to

dismiss under both Rules 12(b)(1) and 12(b)(6), the motion court must address the 12(b)(1) motion first." Id. (citations omitted).

## B. **Failure to State a Claim**

To survive a Rule 12(b)(6) motion to dismiss, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Although a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), more than mere conclusions are required. Indeed, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

Dismissal is appropriate only where the plaintiff has failed to provide some basis for the allegations that support the elements of her claims. See Twombly, 550 U.S. at 570 (requiring "only enough facts to state a claim to relief that is plausible on its face"). When considering a motion to dismiss, the pleading is to be construed liberally, all factual allegations are deemed to be true, and all reasonable inferences must be drawn in the plaintiff's favor. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.2002).

## C. **Preliminary Injunction**

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (citing Munaf v. Green, 553 U.S. 674, 689-90 (2008)). "The party seeking the injunction carries the burden of persuasion to demonstrate, 'by a clear showing,' that the necessary elements are satisfied." Reckitt Benckiser Inc. v. Motomco Ltd., 760 F. Supp. 2d 446, 452 (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)).

Generally speaking, a party must establish four elements to prevail on a motion for a preliminary injunction: (1) a likelihood of irreparable harm; (2) either a likelihood of success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in their favor; (3) that the balance of hardships tips in their favor regardless of the likelihood of success; and (4) that an injunction is in the public interest. Chobani, LLC v. Dannon Co., Inc., –F. Supp. 3d–, 2016 WL 369364, at *5 (N.D.N.Y. Jan. 29, 2016) (surveying preliminary injunction case law post-Winter); see also Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 895 (2d Cir. 2015) (incorporating balance-of-hardships and public interest factors); Am. Civil Liberties Union v. Clapper, 785 F.3d 787, 825 (2d Cir. 2015) (same).

Importantly, "[w]hen, as here, the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." Sinisgallo v. Town of Islip Housing Auth., 865 F. Supp. 2d 307, 328 (E.D.N.Y. 2012) (citations omitted).

Equally important, this likelihood-of-success standard is slightly modified when the preliminary injunctive relief the movant seeks would alter the status quo or provide the moving party with substantially all the relief sought in the underlying case. Forest City Daly Hous., Inc. v. Town of N. Hempstead, 175 F.3d 144, 150 (2d Cir. 1999).

Therefore, in these cases, "the movant must show a substantial likelihood of success on the merits, i.e. that [its] cause is considerably more likely to succeed than fail (together, of course, with the requisite irreparable injury)." Eng v. Smith, 849 F.2d 80, 81 (2d Cir. 1988); see also Chobani, LLC, 2016 WL 369364, at *7 ("[A] party seeking a "mandatory" preliminary

injunction must demonstrate a "clear" or "substantial" likelihood of success on the merits in addition to the other strictures imposed by the standard . . . ." (citing <u>Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.</u>, 60 F.3d 27, 34 (2d Cir. 1995))).

### D.  Relevant Statutes

Under the FHA, it is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap."  42 U.S.C. § 3604(f)(1).  The FHA further provides that it is unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap."  § 3604(f)(2).

Likewise, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

Both the FHA and the ADA apply to municipal zoning decisions.  <u>See, e.g.</u>, <u>Forest City Daly Hous., Inc.</u>, 175 F.3d at 151.  "To establish discrimination under either the [FHA] or the ADA, plaintiffs have three available theories:  (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation."  <u>Tsombanidis v. West Haven Fire Dept.</u>, 352 F.3d 565, 573 (2d Cir. 2003).

## IV. DISCUSSION

### A. Standing[3]

The City contends that SBS has failed to establish standing because plaintiff failed to allege any facts to support the conclusion that the prospective users or residents of the Site qualify for protection under the relevant statutes.  See Def.'s Mem. at 3-4.

"In every federal case, the party bringing the suit must establish standing to prosecute the action."  Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004).  To establish standing, a private plaintiff must show that it:  (1) suffered an "injury in fact" that is concrete and particularized, and actual or imminent, not conjectural or hypothetical; (2) that the injury is fairly traceable to the challenged action; and (3) it is likely that the injury will be redressed by a favorable decision.  Lujan v. Defs. of Wildlife, 504 U.S. 555 (1992).

Additionally, an organization may assert standing "on behalf of its members under the theory of organizational or associational standing."  Human Res. Research & Mgmt. Grp., Inc. v. Cnty. of Suffolk, 687 F. Supp. 2d 237, 249 (E.D.N.Y. 2010) (citations omitted).  This theory of standing permits an entity to "file suit on its own behalf 'to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.'"  Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 649 (2d Cir. 1998) (quoting Warth v. Seldin, 422 U.S. 490, 511 (1975)).

Accordingly, an organization may bring suit on behalf of its members by demonstrating that:  "(a) its members would otherwise have standing to sue in their own right; (b) the

---

[3] "To survive a defendant's Rule 12(b)(1) motion to dismiss for lack of standing, plaintiffs must allege facts that affirmatively and plausibly suggest that [they have] standing to sue."  Kiryas Joel Alliance v. Village of Kiryas Joel, 495 F. App'x 183, 188 (2d Cir. 2012) (summary order).

interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Giuliani, 143 F.3d at 649 (quoting Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343-45 (1977)).

"Standing under the [FHA] is as broad as Article III permits." Mhany Mgmt., Inc. v. Cty. of Nassau, –F.3d–, 2016 WL 1128424, at *13 (2d Cir. Mar. 23, 2016). To that end, the FHA confers standing to challenge discriminatory housing practices on any "aggrieved person," defined as anyone who "(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 424 (2d Cir. 1995) (citing 42 U.S.C. §§ 3602(I), 3613(a)(1)(A)).

Further, federal courts have held that a person who is not himself handicapped, but who is prevented from providing housing for handicapped persons by a municipality's discriminatory acts, has standing to sue under the FHA. See, e.g., Havens Realty Corp. v. Coleman, 455 U.S. 363, 372 (1982); Warth, 422 U.S. at 505–06 (requiring for standing purposes that zoning restrictions were applied to plaintiffs' particular projects that would supply housing to protected class); Wis. Cmty. Servs. v. City of Milwaukee, 465 F.3d 737, 746–53 (7th Cir. 2006) (permitting operator of mental health clinic to sue municipality under ADA for denial of permit to move clinic to new location); Baxter v. Belleville, 720 F. Supp. 720, 730–31 (S.D. Ill. 1989) (finding standing where plaintiff's claimed injury was loss of income from tenants because municipality refused to approve plans for housing development).

In this case, SBS's complaint alleges that its PDD application was improperly denied based upon discrimination directed towards the mental illnesses of its clients. Such a denial constitutes an "injury in fact" that is "fairly traceable" to defendant's actions. Plaintiff is also an "aggrieved person" under the FHA, as plaintiff claims to have been injured by a discriminatory housing practice—the denial of the PDD application due to unlawful prejudice against plaintiff's disabled clients. Consequently, plaintiff has demonstrated that it has standing to bring this action on its own behalf under the FHA.

Furthermore, SBS also has organizational standing to bring this action on behalf of its clients, since (1) it serves a class of individuals allegedly being discriminated against—individuals with mental illness seeking housing; (2) the interests of these individuals are germane to plaintiff, which is a non-profit seeking to provide services to such a class; and (3) no individual participation of class members is necessary. See Human Res. Research, 687 F. Supp. 2d at 253. Accordingly, plaintiff has demonstrated that it has standing to pursue this action.

### B. The City's Motion to Dismiss

Next, the City argues that SBS has failed to properly plead that the individuals it seeks to assist constitute "disabled" or "handicapped" individuals as defined in the relevant statutes; alternatively, the City argues that the proposed housing plaintiff seeks to provide those individuals does not constitute a "dwelling" under the FHA. See Def.'s Mem. at 1.

#### 1. Disability Under the FHA and ADA

To demonstrate disability under these statutes, a plaintiff must show: (1) a physical or mental impairment which substantially limits one or more major life activities; (2) a record of having such an impairment; or (3) that they are regarded as having such an

impairment.  Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48

(2d Cir. 2002) ("RECAP"), superseded by statute on other grounds as recognized in

Anderson Grp., LLC v. City of Saratoga Springs, 805 F.3d 34, 46 (2d Cir. 2015); see also 42

U.S.C. § 12102(1) (defining "disability" under the ADA); 42 U.S.C. § 3602(h) (defining

"handicap" under FHA).

The FHA's definition of "handicapped" includes persons with a mental illness or

personality disorder, such as recovering alcoholics and drug addicts.  See Valley Hous. LP v.

City of Derby, 802 F. Supp. 2d 359, 384 (D. Conn. 2011) ("Mental illness is also recognized

as a handicap and disability."); Oxford House, Inc. v. Twp. of Cherry Hill, 799 F. Supp. 450,

458-59 (D.N.J. 1992) (finding substantially same).  In a similar vein, the inability to live

independently has been found to constitute a substantial limitation on one's ability to "care for

themselves."  RECAP, 294 F.3d at 47-48; United States v. Borough of Audubon, N.J., 797 F.

Supp. 353, 359 (D.N.J. 1991).

In the complaint, SBS alleges that it is a not-for-profit corporation currently providing

outpatient mental health services to individuals with mental illness at its existing location, 103

Ford Street, in Ogdensburg.  See Compl. ¶¶ 2, 3, 16, 20.  It avers that the individuals that will

reside at the Site suffer from mental illness.  Id. ¶¶ 5, 11, 23, 25, 62, 63, 65, 84, 113, 126-29,

138, 141, 144, 148.

Further, SBS's proposed facility will provide such individuals with mental health

supportive services, such as supportive housing and respite / hospital diversion housing, in a

safe and secure environment "where they could live independently and/or work toward

regaining optimal functioning as valued members of society."  Compl. ¶¶ 5, 21, 22.  Such

housing seeks to move these mentally ill individuals "from out of shelters, hotels/motels or off

the street, where isolation and inconsistent care can hasten their demise." Id. ¶ 23.  In sum, the factual allegations contained in the complaint are sufficient to draw a reasonable inference that SBS's clients have recorded, or are regarded as having, mental impairments which substantially limit a major life activity; that is, that the mental illnesses of plaintiff's clients limit their ability to live independently.

The City's contention that the complaint fails to state a claim rests on analyses of SBS's claims that draw inferences adverse to plaintiff and thus are inappropriate bases for dismissal at the pleading stage.  Given these allegations, plaintiff should have the opportunity to provide further evidence that the mental illnesses suffered by its clients meet the criteria of the FHA and the ADA.  Therefore, the complaint sufficiently alleges that the proposed residents of the Site have a "handicap" under the FHA and "disability" under the ADA.

### 2. **FHA's Definition of "Dwelling"**

The City also contends that the complaint fails to properly allege that the facility proposed by SBS constitutes a "dwelling" for purposes of the FHA and contends plaintiff's proposed facility should instead be considered transient housing.  See Def.'s Mem. at 1.

Pursuant to the FHA, a dwelling is "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families".  42 U.S.C. §3602(b).  Courts have found that, for purposes of the FHA, a dwelling includes a "'temporary or permanent dwelling place, abode or habitation to which one intends to return as distinguished from the place of temporary sojourn or transient visit.'"  Jenkins v. N.Y.C. Dep't of Homeless Servs., 643 F. Supp. 2d 507, (S.D.N.Y. 2009) (quoting United States v. Hughes Memorial Home, 396 F. Supp. 544, 548-9 (W.D. Va. 1975)).

- 14 -

Both homeless shelters and treatment facilities have been found to constitute dwellings under the FHA.  See Lakeside Resort Enters., LP v. Bd. of Supervisors of Palmyra Twp., 455 F.3d 154. 159 (3d Cir. 2006); see also Cmty. House, Inc. v. City of Boise, 490 F.3d 1041, 1044 n. 2 (9th Cir. 2007); Jenkins, 643 F. Supp. 2d at 518; Woods v. Foster, 884 F. Supp. 1169, 1172 (N.D. Ill. 1995).

For example, in Lakeside, the Third Circuit applied a two-part test to determine whether a drug and alcohol treatment center constituted a dwelling under the FHA:

> First, we must decide whether the facility is intended or designed for occupants who intend to remain in the facility for any significant period of time. Second, we must determine whether those occupants would view the facility as a place to return to during that period.

Lakeside, 455 F.3d at 158.

In the complaint, SBS alleges that its proposed facility would provide "supportive housing, respite / hospital diversion housing, rental office space and mental health support services" to its mentally ill patients.  See Compl. ¶ 22.  It states that SBS's motive for moving to the Site is to provide its patients suffering from mental illness with housing opportunities and a "safe and secure environment" where they could "live independently."  Id. ¶ 20-21. The complaint notes that SBS seeks to move its mentally ill clients from "out of shelters, hotels/motels or off the street."  Id. ¶ 23.

While SBS's complaint does not delineate the exact amount of time it is seeking to provide housing for its mentally ill clients, the complaint clearly contemplates providing housing in order to divert these individuals from hospitals or homelessness.  Such housing would therefore be more similar to a homeless shelter or treatment facility, rather than a motel or other transient establishment, in that SBS's clients would view such housing as "a

place to return to" during their period of stay.  Accordingly, plaintiff has sufficiently pleaded that the housing it proposes to provide its clients constitutes a dwelling under the FHA.

**C.  Preliminary Injunction**

**1.  Substantial Likelihood of Success on the Merits**

SBS contends that the City violated the FHA and ADA by (1) allowing the prejudices of members of its community to influence its decisionmaking process and (2) applying different procedural and substantive criteria to plaintiff's application than the criteria used to evaluate other similarly situated PDD applications.

As discussed above, a plaintiff who alleges violations under the FHA and ADA may proceed under three different theories:  (a) disparate treatment; (b) disparate impact; and/or (c) a failure to make reasonable accommodation.  See Doe v. Pfrommer, 148 F.3d 73, 82 (2d Cir. 1998).  SBS alleges both disparate treatment and disparate impact.

**a.  Disparate Treatment**

SBS alleges that the City denied its PDD application due to disparate treatment, or intentional discrimination, against its disabled clients.

SBS's claims of intentional discrimination pursuant to the FHA and the ADA will be analyzed using the McDonnell Douglas burden-shifting analysis.  RECAP, 294 F.3d at 48; Valley Hous. LP, 802 F. Supp. 2d at 386.  Under this analysis, a plaintiff must first establish a prima facie case of discrimination by presenting evidence that "animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive."  LeBlanc-Sternberg, 67 F.3d at 425.

If the plaintiff establishes this prima facie case, the burden of production shifts to the defendant to provide a legitimate, nondiscriminatory reason for the decision.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir. 1999).  If the defendant meets that burden, the plaintiff must then prove that the defendant intentionally discriminated on the basis of a prohibited ground.  See Reeves, 530 U.S. at 143.

Courts consider the following factors when determining whether a municipal action was undertaken with discriminatory intent:  (1) the discriminatory impact of the action; (2) the historical background of the action; (3) the sequence of events leading up to the challenged action; (4) departures from normal procedural sequences; and (5) departures from normal substantive criteria.  LeBlanc, 67 F.3d at 425; Sunrise Dev., Inc. v. Town of Huntington, 62 F. Supp. 2d 762, 774 (E.D.N.Y. 1999).

Importantly, "[a] plaintiff need not prove that discrimination was the sole motivating factor in the challenged act; rather, a plaintiff need only show that discrimination was a motivating factor."  Sunrise Dev., 62 F. Supp. 2d at 774 (citing Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 265–66 (1977)). (2d Cir. 1998).

SBS cites to a number of facts that it argues constitute evidence substantiating its claim that the denial of its PDD application resulted, in significant part, from discriminatory animus toward its mentally disabled clients.

### i. Supermajority Requirement

Pursuant to New York State General Municipal Law 239-m, if a county planning agency "recommends modification or disapproval of a proposed action, the referring

[municipality] shall not act contrary to such recommendation except by a vote of a majority plus one of all the members thereof." See N.Y. GEN. MUN. LAW § 239-m(6).

In other words, if a qualifying municipal zoning action requires referral to a county planning agency for review of inter-community or county-wide considerations and such county planning agency recommends modification or disapproval, the municipality may only then approve such action without modification by a supermajority vote.

In this case, SBS points to numerous comments by City Council members indicating their desire to remove this supermajority requirement, even when the City's legal counsel advised that such action would be contrary to state law and would likely invalidate portions of the City Code. See, e.g., Bayne Aff., Ex. A, at 1:50:00 - 1:60:00; Bayne Aff., Ex. D, at 1:21:00 - 1:25:00. According to plaintiff, these comments evince a hostility toward plaintiff's application and a desire to override state law to ensure the denial of plaintiff's application.

However, review of the video from both the April 13, 2015 and May 26, 2015 City Council meetings shows that the comments concerning the supermajority requirements were not directed specifically towards SBS's PDD application, but were directed more generally toward any City zoning action that would require a supermajority vote by the City Council.

For instance, Councilor Morley specifically stated that his proposed amendment to a supermajority requirement contained in the City's then-draft ARD law was done in hopes that the New York State legislature would amend General Municipal Law 239-m. See Bayne Aff., Ex. D, at 1:23:00. Further, no action was actually taken to challenge § 239-m or otherwise attempt to modify the supermajority requirement.

As both the City and County planning boards recommended disapproval of SBS's application to the Council, the supermajority requirement was never at issue with respect to

plaintiff's application. As a result, the Councilors' statements do not provide evidence that the City's denial of plaintiff's application was taken with discriminatory intent.

### ii. Other Applications

SBS next alleges that two other projects were treated differently than plaintiff's application and such differing treatment resulted from the general public's approval of such projects. See Pl.'s Mem. at 24. One of these projects concerned the renovation of the former Washington Elementary School into apartments; the other concerned an application by the St. Vincent de Paul Church to rezone a parcel of land from single family residential to a Residential / Business Mixed Use District for a clothing store.

Both projects were mentioned in various City Council meetings, but the specifics of each project are vague and SBS has failed to demonstrate that either project's application for a zoning action were similarly situated to plaintiff's application. As a result, at this point in the proceedings, the potentially differing treatment of these projects does not evince an improper motive for the City's denial of plaintiff's application.

### iii. Delay

SBS contends that the City Council departed from its normal procedural and substantive rules by attempting to place plaintiff's PDD application on hold until the City could finalize and pass the ARD law. See Pl.'s Mem. at 7, 25.

However, the City is correct to argue that, in fact, the City Council did not depart from its normal procedure, since SBS's PDD application was considered pursuant to the procedure in place in the City Code. See Def.'s Mem. at 16.

Nevertheless, some aspects of the process employed by the City Council are certainly questionable. For example, at the April 13, 2015 City Council meeting, the Council was

informed by the Director of Planning and Development that a PDD application had been received from SBS. In the ordinary course of business, the application would need to be referred to both the City and County Planning boards for review and recommendation and a public hearing would need to be scheduled before the City Council. In fact, the City Code considers these responsive actions to be a ministerial matter. <u>See</u> City Code § 221-40(C).

Despite this fact, the City Council spent approximately one hour debating whether a public hearing should even be held, whether SBS should be required to reapply when and if the ARD law was passed, or whether it was appropriate to perhaps table plaintiff's application indefinitely until the ARD law was passed.[4] <u>See, e.g.</u>, Bayne Aff., Ex. A, 58:00 - 1:46:00.

The stated reasons given by council members in favor of delaying SBS's application was their belief that the ARD law would provide "better protection" for the neighborhood and permit the City Council to "control what happens to properties in single family residential neighborhoods." Bayne Aff., Ex. A, at 1:00:00, 1:16:00. For instance, Councilor Morley cautioned, "[w]e could be destroying the integrity of a single family residential neighborhood. That is the thing that we have to be careful about. That is what we are here to protect." <u>Id</u>. at 1:15:00. Likewise, Councilor Skamperle acknowledged that plaintiff's application had stirred animosity in the neighborhood and that the application should meet criteria that is acceptable to the neighborhood. <u>Id</u>. at 1:16:00.

Importantly, however, the council members were advised by both Mayor Nelson and City Attorney Andrew Silver that failure to consider a completed application under the then-existing PDD law would deny the applicant due process and would likely result in a

---

[4] Ultimately, a motion to table plaintiff's application was defeated 4-3 by the City Council at this meeting. Bayne Aff., Ex. A, at 1:44:00.

lawsuit by SBS.  Bayne Aff., Ex. A, at 1:11:00, 1:17:00, 1:19:00, 1:32:00, 1:34:00, 1:39:00, 1:42:00.  In fact, Mayor Nelson even openly questioned whether an application by a different entity, such as a car dealership, would face the same opposition and requested delay.  Id. at 1:15:00.

While the conduct of the April 13, 2015 meeting does not in and of itself reveal an unlawful discriminatory intent, it is certainly unusual.  The opposition by some councilors to even considering SBS's application in accordance with the clear requirements of the City Code and their related attempt to delay plaintiff's application until an amendment to the ARD law could be passed, which one could reasonably infer would be less advantageous to plaintiff, informs the sequence of events that followed.

### iv.  Amendment of the ARD law

SBS also asserts that the ARD was later modified to limit its application to parcels that were less than two (2) acres in size with full awareness that plaintiff's proposed PDD Site was in excess of two (2) acres.  See Pl.'s Mem. at 24.  Plaintiff contends that this modification was made to preclude plaintiff from applying under the ARD law and is further evidence of animus against plaintiff and its clients.

However, through the affidavit of the director of the City's Planning Department, the City has demonstrated that the modifications to the City's Zoning Code began in 2012 and the creation of the ARD law was conceived in the summer of 2014, with four public meetings being held before plaintiff's application was even received.  See Smith Aff. at 9-10.

At the May 26, 2015 City Council meeting, the City Council considered adoption of the ARD law.  Members of the council expressed confusion as to what properties would be included in the ARD district and therefore capable of applying for a permit under the new

ARD law. There also was confusion as to whether parcels like the Site, which were over two acres in size and capable of applying for PDD status, should be eligible to apply under the new ARD law.

As a result, Councilor Hosmer proposed an amendment to the ARD law to exclude properties in excess of two acres from its purview, making it clear that parcels less than two acres in size would be eligible to apply only for a permit under the ARD law and properties two acres or larger would be eligible to apply for PDD status. See Bayne Aff., Ex. D, 1:35:00. The motion to amend was passed by the City Council by a vote of four to three. Id. at 1:41:00.

There is no evidence contained in the City Council meeting to suggest that the amendment to the ARD law to exclude parcels two acres or greater was passed as a result of animosity towards SBS. The ARD law may have been crafted to assist in the redevelopment of parcels that could not apply for PDD status due to their small size. If so, it was reasonable to limit the ARD law to properties under two acres.

However, this amendment was contrary to the position conveyed at the April 13, 2015 meeting, where certain council members argued that it was important for SBS's application to be considered under the criteria of the ARD law as such criteria would provide "better protection" for the neighborhood. And by affirmatively choosing to omit parcels greater than two acres, such as the Site, from the ARD law, its excludes such applications from the "better protection" for which it was originally designed. These inconsistencies further undercut the rationale for seeking to delay plaintiff's application at the April 13, 2015 meeting.

### v. **Local Opposition**

SBS also asserts that the City Council permitted the public's prejudices concerning plaintiff's mentally ill clients to become part of the decisionmaking process, even though such concerns were unfounded and irrelevant to the zoning considerations. See Pl.'s Mem. at 21-22.

As discussed above, a public hearing was held on May 11, 2015 concerning SBS's application. And as the City correctly notes, citizens spoke out both in favor of and in opposition to plaintiff's application; each speaker was allotted five minutes to speak; all those who wanted to speak were given an unobstructed opportunity to do so; and no City Council member expressed approval or disapproval of any statement made by any citizen speaker. See Def.'s Mem. at 13.

During this meeting, some citizen speakers raised concerns regarding the hours of operation of SBS's facility and the "eyesore" nature of SBS's existing location. Others spoke more generally about their concerns that mentally ill individuals living in plaintiff's facility would pose a threat to the neighborhood, particularly young children. For example, one resident stated that he was greatly concerned about the "safety of residents" and the "potential physical and mental harm" exposure to plaintiff's mentally ill clients may have on residents young and old. See Bayne Aff., Ex. C, at 9:00.

Another indicated that she was "extremely fearful" of living next to such a facility and would cease sitting on her porch or working in her yard and that the neighborhood would be an "unsafe zone" for walking due to presence of mentally ill individuals in the neighborhood. Bayne Aff., Ex. C, 19:00.

Further, a petition signed by over four hundred residents and presented to the City Council requested that the Council "keep our neighborhood safe for families and prevent negative impact to our homes." Bayne Aff., Ex. C, at 30:00. A number of other residents expressed concern that the value of their homes would decrease as a result of its proximity to plaintiff's facility.

A review of the statements made by residents at the May 11, 2015 meeting reveal a number of clearly stereotypical ideas about the mentally ill; indeed, exactly the kind of unfair bias at which the FHA and ADA are aimed at preventing. To be sure, several citizens expressed facially neutral concerns stemming from the fact that plaintiff's proposed use would be inconsistent with the intent of the single family residential district. But it was specifically plaintiff's proposal to provide housing and services to individuals with mental illness—along with the perceived threat to resident safety and home equity—that resulted in the objections of many of the residents.

"[A] decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter." Innovative Health Systems, Inc. v. City of White Plains, 117 F.3d 37, 49 (2d Cir. 1997). If the City decided to deny SBS's application because of the expressed bias of residents, intentional discrimination would be shown. See Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs, 257 F. Supp. 2d 208, 227 (D.D.C. 2003) ("[E]ven where individual members of government are found not to be biased themselves, plaintiffs may demonstrate a violation of the [FHA] if they can show that discriminatory governmental actions are taken in response to a significant community bias."); Borough of Audubon, N.J., 797 F. Supp. at 361 ("Discriminatory intent may be established where animus towards a

protected group is a significant factor in the community opposition to which the commissioners are responding.").

But what affect, if any, community opposition had on the City Council's decision to deny SBS's application is unknown. This is so because the City Council failed to articulate any of their reasons for denying SBS's application. <u>When taking their vote on May 28, 2015, no member of the City Council stated on the record their reasons for voting against plaintiff's application.</u> See Bayne Aff., Ex. E, at 9:00.

Indeed, although "protection of established or permitted uses in the vicinity" is a permissible consideration in the review of a PDD application, no Councilor made any attempt to explain how the denial of SBS's application protected the single family residential district or otherwise attempted to demonstrate that the reasons for their vote were independent of, and not directly influenced by, the improper prejudices recently expressed by a significant portion of the community opposition against plaintiff's mentally ill clients.

In fact, after a review of City Council meetings, it appears that no councilor ever discussed the criteria for proper consideration of a PDD application pursuant to City Code § 221-40(F)(2) with respect to plaintiff's application at any time during the application process. <u>Further, no written decision was ever prepared or issued concerning plaintiff's application detailing the reasons for its denial.</u>

Moreover, comments by councilors at the April 13, 2015 evidence that their desire to analyze plaintiff's application under the ARD law resulted from their belief that the law provided more public input and would ensure that a project "meets criteria that is acceptable to the neighborhood." <u>See</u> Bayne Aff., Ex. A, at 1:09:00, 1:16:00.

While obtaining public comment on a matter of public concern is commendable, the City Council may not cede its decisionmaking authority to the public, especially when a significant portion of public opposition was based on improper biases towards SBS's clients. It is the obligation of the City Council to properly consider an application according to the criteria set forth in its City Code, independent of any prejudices toward the disabled. Plaintiff has made a compelling showing to indicate that this obligation was breached in the present case.

The City Council's failure to detail its reasoning for the denial of SBS's application is additionally problematic when various details surrounding the City and County planning board recommendations are considered. For example, staff at the County Planning Department reviewed the plaintiff's application, determined that the application followed the appropriate process, and that the proposed use was compatible with the surrounding residential neighborhood. See Bayne Aff., Ex. D, at 29:00 -32:00. As a result, staff at the County Planning Department recommended approval of plaintiff's application. Id.

Despite this review, the County Planning Board itself then voted to recommend disapproval of SBS's application, citing its belief that plaintiff's application was better reviewed under the ARD law. As presented to the City Council on May 26, 2015, the disapproval recommendation from the County Planning Board was, on its face, not based upon the criteria controlling the proper determination of a PDD application.

Further, on May 27, 2015, the Chairman of the County Planning Board requested that the City Council resubmit SBS's application for reconsideration as the Board's disapproval recommendation was based upon the incorrect assumption that plaintiff's application would be considered under the ARD law. At the time, the Chairman further stated that plaintiff's

application was valid and consistent with the findings of staff of the County Planning Department.

Given that the County Planning Board's recommendation of disapproval was clearly not based upon proper consideration of the criteria for a PDD application and the underlying staff report recommended approval, the obligation of the City Council to properly evaluate plaintiff's application according to the criteria provided in the City Code was of utmost importance.  This was not done.

In its opposition to SBS's motion, the City notes various potentially non-discriminatory reasons presented by residents at the May 11, 2015 public meeting, such as objections to plaintiff's hours of operation.  See Def.'s Mem. at 15.  Again, none of these reasons were adopted by the City Council or even contemporaneously utilized to demonstrate that denial of plaintiff's application was not influenced by the opposition's discriminatory reasons.

**vi.  Analysis**

By completely failing to describe the reasoning and logic behind the denial of SBS's application, the City Council has effectively created a black box where any justifications are a mystery.  While at least a significant portion of the information placed into that box consisted of community opposition based upon impermissible discrimination, the City has asked for a ruling that the denial was free of any improper prejudices.  This cannot be done!

The sequence of events, strong community opposition partially based upon improper generalizations concerning SBS's mentally ill clients, and the City's failure to articulate any rationale for its denial sufficiently demonstrate that improper animus against the disabled individuals was a significant factor in the decision to deny plaintiff's application.  As such, plaintiff has established a prima facie case of intentional discrimination.

As discussed above, the City has failed to offer any legitimate, non-discriminatory reason for its denial of SBS's application. Given this failure to provide any legitimate non-discriminatory reasons, discriminatory animus must have been a significant factor behind such denial. As a result, plaintiff has established a substantial likelihood of success on the merits with respect to their discriminatory intent claim.

### b. Disparate Impact

To establish a prima facie disparate impact case, a plaintiff "must provide evidence showing (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." Quad Enters. Co., LLC v. Town of Southold, 369 F. App'x 202, 206 (2d Cir. 2010) (summary order). "Although the plaintiff need not show discriminatory intent under this theory, it must prove that the practice actually or predictably results in . . . discrimination." Id.

Generally, a plaintiff must offer statistical, quantitative evidence showing the disparity between the two groups, or some other analytical mechanism to determine disproportionate impact. Tsombanidis, 352 F.3d at 576. However, a plaintiff can also offer proof that allows permits the court to make an assessment that there is a qualitatively disproportionate impact on the members of the group at issue. Id. at 577.

In this case, SBS argues that the City Council crafted the ARD law in such a way as to provide greater opportunity for the irrational fears and prejudices of the community to affect the City's decisionmaking process. Further, plaintiff states that the new ARD law will prevent the establishment of any facility providing services to the mentally ill in a residential neighborhood.

- 28 -

This may be true.  However, SBS has made no effort to make the necessary quantitative or qualitative comparison to support its disparate impact claim and simply relies on the argument that if they cannot utilize the Site for supportive housing, there must be a disparate impact.  At this point in the proceedings, plaintiff has failed to demonstrate a substantial likelihood of success on the merits of its disparate impact claim.

## 2. Irreparable Harm

"Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages."  Forest City Daly Hous., Inc. v. Town of North Hempstead, 175 F.3d 144, 153 (2d Cir. 1999) (internal quotation omitted).

The Eleventh Circuit has taken the position that a showing of a substantial likelihood that a defendant has violated the FHA is itself sufficient to create a presumption of irreparable harm, which shifts the burden to defendant to prove that any injury that may occur is not irreparable.  See Gresham v. Windrush Partners, Ltd., 730 F.2d 1417, 1423–24 (11th Cir.1984), cert. denied, 469 U.S. 882 (1984); see also Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 803 (3d Cir. 1989); Gov't of Virgin Islands Dep't of Conservation & Cultural Affairs v. Virgin Islands Paving, Inc., 714 F.2d 283, 286 (3d Cir. 1983).

The Second Circuit has not taken a position concerning this presumption.  See Forest City, 175 F.3d at 153 (finding that plaintiff did not establish a likelihood of success on the merits and therefore the irreparable harm issue need not be decided).  However, regardless of whether the presumption applies, SBS has established irreparable harm through evidence that, because SBS has been prevented from moving to the Site, it is being deprived of the ability to provide shelter, programs, and services to its mentally ill clients.

SBS is a not-for-profit entity dedicated to providing services to assist individuals with mental illness.  It has purchased the Site in an attempt to continue in its efforts to effect that goal.  As a result of the City's discriminatory actions, plaintiff's goal of providing housing and services to those suffering from mental illness  is "thwarted by each passing day."  Stewart B. McKinney Found., Inc. v. Town Planning & Zoning Comm'n, 790 F. Supp. 2d 1197, 1208 (D. Conn. 1992).

The affidavits of SBS director David Bayne demonstrate that SBS's clients, including those with schizophrenia and severe depression, are facing distinctive, immediate injuries if the necessary supportive housing and services offered by SBS remain unavailable.  According to Bayne, these clients will end up "in the streets, hospitalized and/or institutionalized."  See Bayne Aff. ¶¶ 10-12.

Further, as a result of the financial constraint resulting from presently operating two buildings, SBS has had to eliminate its breakfast program, which provides meals to its mentally ill clients, and has had to eliminate a program coordinator position.  See Reply Affidavit of David Bayne ¶¶ 4, 9.

In essence, the discrimination against SBS yielded two separate and cognizable injuries.  The first injury, the monetary loss concerning operational expenses, was only suffered by SBS itself, and dictates a remedy of monetary damages.  The second injury, the discrimination against SBS's mentally ill clients who are unable to obtain supportive housing and services from the unopened facility, are suffered in part by SBS's clients, and in part by SBS itself.  This injury dictates an equitable remedy.  See Stewart B. McKinney Found., Inc., 790 F. Supp. at 1209 ("Monetary damages would not adequately compensate the plaintiff for its inability to achieve its purpose of providing housing in the Oldfield property to needy

HIV-infected persons pending a final determination of this action.  Therefore, the plaintiff would suffer irreparable harm if a preliminary injunction did not issue.").

By hindering SBS's attempts to relocate to the Site, a location that permits it to provide supportive housing to at risk mentally ill individuals and would better accommodate the programs SBS currently offers, the City is preventing SBS from housing and serving its clients and diminishing the quality and variety of its programs, thereby undermining its purpose.  A monetary award would not adequately compensate plaintiff for these injuries.

Further, "[c]ourts have held that the deprivation of treatment needed to recover from addiction or prevent relapse constitutes irreparable injury."  Innovative Health Sys., Inc. v. City of White Plains, 931 F. Supp. 222, 240 (S.D.N.Y. 1996).  Irreparable injury exists where there is a deprivation of housing or services that poses a serious risk of harm to vulnerable individuals.  See Easter Seal Soc'y v. Twp. of N. Bergen, 798 F. Supp. 228, 237 (D.N.J. 1992) ("[F]or each day that this project is delayed, eight protected individuals are forced to move into other environments which endanger their recent recovery" constituting  irreparable harm); Oxford House–Evergreen v. City of Plainfield, 769 F. Supp. 1329, 1345 (D.N.J. 1991) (holding that closure of group home for substance abusers would cause irreparable harm due to loss of home and supportive and stable environment).

The City's actions have deprived SBS of its ability to pursue its mission and to provide housing and services to its mentally ill clients and this denial constitutes irreparable harm.

### 3.  Balance of Hardships

As discussed above, SBS has demonstrated both a substantial likelihood of success on the merits as well as irreparable harm in the absence of injunctive relief.  Although the City has an interest in maintaining the integrity of its City Code and zoning regulations, it

cannot assert an equitable interest in perpetuating discriminatory actions in the administration and enforcement of either the City Code or those regulations.  Further, the City will suffer no damage in the entry of a preliminary injunction approving plaintiff's PDD application.  Accordingly, the balance of hardships favors plaintiff.

### 4. **Public Interest**

The FHA was "a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream."  Bentley v. Peace & Quiet Realty 2 LLC, 367 F. Supp. 2d 341, 345 (E.D.N.Y. 2005) (citations omitted); see also 42 U.S.C. § 3601 (stating the FHA is intended to provide "fair housing throughout the United States").  Indeed, the FHA "repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as individuals.  Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion."  Laflamme v. New Horizons, Inc., 605 F. Supp. 2d 378, 386 (D. Conn. 2009) (citations omitted).

Although it has long been recognized that local governments have a substantial interest in passing and enforcing ordinances to regulate land usage, it goes without saying that such ordinances cannot be applied in an unlawfully discriminatory manner.  When officials choose to do otherwise, federal and state interests transcend the deference ordinarily afforded to these local land use decisions.  Accordingly, the public interest in this case weighs in favor of granting the requested relief.

**5. <u>Summary</u>**

In sum, SBS has demonstrated, by a clear showing, the necessary elements required for injunctive relief to be entered in its favor. As a result, equitable powers will be exercised to prevent the City from continuing discriminatory action against SBS.

A court may affirmatively require a municipality to approve a plaintiff's zoning request when the requirements for a preliminary injunction have been presented. <u>See, e.g.</u>, <u>Innovative Health Sys.</u>, 931 F. Supp. at 245 (directing the City to issue a building permit for plaintiff's substance abuse treatment facility); <u>Cmty. Servs., Inc. v. Heidelberg Twp.</u>, 439 F. Supp. 2d 380, 400 (M.D. Pa. 2006) (ordering City to issue the necessary use and occupancy permits for a home housing mentally challenged individuals); <u>see also</u> <u>First Step, Inc. v. City of New London</u>, 247 F. Supp. 2d 135, 157 (D. Conn. 2003) (requiring City to issue a final special use permit for plaintiff's mental health facility subject to conditions).

Therefore, the City will be required to approve SBS's application to establish a PDD at the Site in order to establish a mental health facility consistent with its application. However, pursuant to the City Code, approval of a PDD application does not permit an approved use to operate immediately. Pursuant to § 221-40(I) of the City Code, SBS is still required to submit a final development plan to the City Planning Board for site plan review prior to issuance of a building permit.

The City may still require such submissions, but is advised that such review shall be consistent with the criteria delineated in the City Code, absent of any improper prejudices, and without additional conditions, unreasonable or overly stringent interpretation of provisions of the zoning regulations, or other undue delay.

**6. Security**

The only question remaining is whether, and for what value, SBS must post

security.  See FED. R. CIV. P. 65(c) ("The court may issue a preliminary injunction . . . only if

the movant gives security in an amount that the court considers proper to pay the costs and

damages sustained by any party found to have been wrongfully enjoined or restrained.").

Although the requirements of Rule 65(c) are phrased in mandatory terms, "[t]he

Second Circuit has held that a district court may dispense with security where there has been

no proof of likelihood of harm to the party enjoined."  Petrie Method, Inc. v. Petrie, 1988 WL

135375, at *3 (E.D.N.Y. Dec. 6, 1988) (citing Int'l. Controls Corp. v. Vesco, 490 F.2d 1134,

1356 (2d Cir. 1974); see also Ferguson v. Tabah, 288 F.2d 665, 675 (2d Cir. 1961); Bronson

v. Crestwood Lake Sect. 1 Hold. Corp., 724 F. Supp. 148, 159 (S.D.N.Y. 2006).

In the present case, there is no likelihood of harm to the City in ordering it to approve

SBS's application.  Moreover, the City has not requested security in its opposition

papers.  Accordingly, the posting of security is not necessary.

**V.  CONCLUSION**

In sum, SBS has standing to pursue its FHA and ADA claims and its complaint states

plausible claims for relief.  As such, the City's cross-motion to dismiss will be denied.

Further, plaintiff has established that it is substantially likely to succeed on the merits of its

intentional discrimination claim and that it will suffer irreparable harm if injunctive relief is not

granted.  Accordingly, plaintiff's motion for a preliminary injunction will be granted.

Therefore, it is

ORDERED that

1.  Plaintiff's motion for a preliminary injunction is GRANTED;

2. Defendant shall approve plaintiff's application to establish a Planned Development District with regard to the property located at 1515 Knox Street, Ogdensburg, New York to permit plaintiff to operate a facility providing supportive housing, respite / hospital diversion housing, rental office space, and mental health support services to individuals with mental illnesses and shall file evidence of such approval with the Clerk of the Court on or before April 15, 2016;

3. Defendant may require plaintiff to submit a final development plan to the City Planning Board for site plan review pursuant to § 221-40(I) of the City Code, however, such review shall be consistent with the criteria delineated for such review, and without additional conditions, unreasonable or overly stringent interpretation of provisions of the zoning regulations, or other undue delay;

4. The Court shall retain jurisdiction to monitor implementation of and to enforce this order; and

5. Defendant's cross-motion to dismiss is DENIED in its entirety.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  April 5, 2016
Utica, New York.